**Noel BERTRAND et al., Plaintiffs,**

**v.**

**Marcelo KOPCOW et al., Defendants.**

**Civil Action No. 13–cv–2513–WJM–KMT**

United States District Court,
D. Colorado.

Signed 08/03/2016

Alison Lee Ruttenberg, Alison L. Ruttenberg, Attorney at Law, Boulder, CO, for Plaintiffs.

Christopher Wayne Alber, Colorado Attorney General's Office, Denver, CO, for Defendants.

## ORDER DENYING DEFENDANT SHEILA MONTOYA'S MOTION FOR SUMMARY JUDGMENT

William J. Martínez, United States District Judge

This lawsuit began as a widespread challenge to many alleged wrongdoings committed by the State of Colorado against prisoners and probationers classified as sex offenders, as well as against their family members. Through this Court's rulings and through mootness resulting from the passage of time, two Plaintiffs remain: Scott Winder (the family member of a sex offender and former probationer) and Ronald Murray (a parolee designated as a sex offender due to a juvenile conviction). These two Plaintiffs' respective claims are very different. This order addresses Winder's claim only.

Winder alleges that Defendant Sheila Montoya, a probation officer, violated his Fourth Amendment rights when she coerced his consent to her search of a locked outbuilding on his property. Currently before the Court is Montoya's Motion for Summary Judgment (ECF No.

179), arguing that no reasonable jury could find a lack of valid consent to the search, and that, in any event, she deserves qualified immunity. For the reasons stated below, the Court disagrees and denies Montoya's motion.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

The following facts are undisputed unless attributed to one party or another, or otherwise noted.

## A. Nik Winder's Residence and Employment

At the time of the allegedly unlawful search at issue in this lawsuit, Nik Winder (Scott's brother and a former Plaintiff in this lawsuit) was on probation by order of the Commonwealth of Virginia, having recently fulfilled the prison term imposed upon him for the felonies of criminal solicitation and attempted indecent liberties with a minor. (ECF No. 179 at 3, ¶¶ 1–3.) Through an interstate compact arrangement, Virginia permitted Nik to move to Colorado and continue his probation in this state. ( *Id.* ¶ 6.) Scott, a Colorado resident, says that this relocation was at his urging, so that he could help Nik "get his life back together, create a business where he could make a living, [and] help him get out of debt." (ECF No. 179-5 at 130.)

Nik lived at Scott's home, from which they operated a window washing business. (ECF No. 179 at 3–4, ¶¶ 7–8.) [1] Nik stored some of his window washing ladders in "the shed," a locked outbuilding on Scott's property that would eventually become the focal point of this lawsuit, as described below. (*Id.* at 4, ¶ 10.) Scott says Nik could only get into the shed when he, Scott, unlocked it for him. (ECF No. 179-5 at 45.) Scott further says that this arrangement was normally not a problem because Nik did not use these particular ladders frequently, and because he, Scott, works from home and was "almost always there" when Nik needed the ladders. (*Id.* at 45–47.)

## B. Montoya's Authority to "Visit"

Montoya was Nik's probation officer. (ECF No. 179 at 5, ¶ 21.) Like most probationers, Nik consented to some degree of warrantless searches by his probation offi-

---

**1.** The record does not specify precisely where in Colorado the Winder residence is located. Montoya is a probation officer based in Commerce City (*see* ECF No. 179-8 ¶ 1), but it is unclear whether the Winders live in Commerce City.

cer. For example, he specifically agreed to permit such searches of his "personal residence [and] vehicle." (ECF No. 179–3 ¶ 26.) Montoya also asserts that Nik's "terms of probation specifically allowed Montoya to visit his home and place of employment." (ECF No. 179 at 6, ¶ 29 (underscoring in original).) Scott Winder admits this assertion without qualification. (*See* ECF No. 192 at 6, ¶ 29.) However, given Montoya's use of the word "visit," as opposed to "search," the Court is not sure precisely what has been admitted.

"Visit" is, indeed, the word used in the probation documents cited by Montoya (one from Virginia, one from Colorado). (*See* ECF No. 179–2 ¶ 5 (Virginia form: "I will permit the Probation and Parole Officer to visit my home and place of employment."); ECF No. 179–3 at 3, ¶ 6 (Colorado form: "You shall ... permit the probation officer to visit you at reasonable times at home or elsewhere.").) But "visit" and "search" are not necessarily equivalent. Montoya, furthermore, states that probation officers are "trained not to open drawers, not to operate computers at visits, and to do nothing else invasive. We simply ask to visit or enter a structure and then observe what we see in plain sight." (ECF No. 179–8 ¶ 6.) Nonetheless, the sum of the parties' briefing suggests that they agree that Montoya could search Nik's *residence* without a warrant, and that it would at least be a violation of Nik's probation if he prevented Montoya from physically entering or observing his *place of employment.*

## C. Montoya's Visit

This case revolves around one particular visit that Montoya made to Scott Winder's residence, where Nik also lived. The parties point the Court to nothing in the record specifying the precise date on which this visit happened. Montoya refers to it only as "the day complained of by Scott Winder in his complaint." (ECF No.

179–8 ¶ 16.) The complaint, for its part, says only that it happened "[i]n 2013." (ECF No. 81 ¶ 94.)

In any event, on the day in question, Montoya visited Scott Winder's property. Montoya's motivation for visiting is disputed, as are the precise events themselves.

### 1. Montoya's Version of Events

Montoya says that Nik had previously mentioned storing his ladders in "the shed," so she concluded it was part of his "place of employment" and wanted to inspect it. (ECF No. 179 at 7–8, ¶¶ 37, 39; *see also* ECF No. 179–8 ¶¶ 13–14.) She and her work partner, Maureen Dahl, therefore made a visit for that purpose. (ECF No. 179–8 ¶¶ 15–16.) Upon arrival, Montoya noticed "many cars in the driveway and on the property that were not present on the previous visit." (*Id.* ¶ 16.) She asked Nik about them and Nik responded "that Scott Winder had helped a mechanic open a business in the shed." (*Id.*) Nik further informed Montoya that "the mechanic lived and worked in the shed." (*Id.* ¶ 17.) "Knowing that Nik also had window washing tools in the shed, coupled with the new information that there was a new person on the site, [Montoya] asked Nik if [she and Dahl] could look inside the shed." (*Id.* ¶ 18.) At this point, Nik went and retrieved Scott. (*Id.*)

Montoya claims that she and Scott knew each other fairly well because Scott "attended virtually all of [Nik's] probation meetings at the Probation offices." (*Id.* ¶ 19.) Moreover, Scott "typically spoke for Nik at the meetings, made all the plans for Nik, and seemingly ran every aspect of Nik's probation." (*Id.*) On this occasion, Montoya says, she

> let Scott know that [Nik] told [her] months ago [that] there was window washing equipment in the shed that Nik used in his day-to-day work, which

[Montoya] understood [to mean that] Nik had access to the shed. [Montoya] also noted the extra cars in the yard, and that Nik had told [her] that there was a new mechanic onsite who lived in the shed and worked on cars. [Montoya] also knew that the mechanic had not signed one of the Third Party Notification forms required by [Nik's] Terms of Probation.

(*Id.* ¶ 21.) [2] Scott "confirmed that there was 'work equipment' in the shed, and asked why [Montoya and Dahl] needed to see it." (*Id.* ¶ 22.) Montoya responded that "the shed had Nik's work-related materials and there was a new person on the property ... who had not signed a Third Party Notification form." (*Id.* ¶ 23.)

At this point, "Scott agreed to let [Montoya and Dahl] look at the shed. ... [H]e went back to the house to get the keys. He then led [Montoya and Dahl] directly to the shed, which is on a hill away from the house." (*Id.* ¶ 24.) "There was no confrontation during [the] conversation. If Scott or Nik had objected to letting [Montoya and Dahl] see the shed, [Montoya and Dahl] would have terminated the home visit." (*Id.* ¶ 25.)

Montoya and Dahl spent "less than two minutes" in the shed, found nothing of importance relating to Nik's probation, and then left. (*Id.* ¶ 26.)

### 2. Scott Winder's Version of Events

Scott Winder challenges most aspects of Montoya's story, beginning with her and Dahl's motivation for visiting that day. Contrary to Montoya's claim that Nik had told her about the shed and his storage of ladders there, Scott Winder asserts that, "[p]rior to Montoya conducting the warrantless search of Scott Winder's shed, neither Winder brother had told Montoya that Nik Winder stored any of his work equipment in the shed." (ECF No. 192 at 9, ¶ 43.) [3] Rather, on the day of the search, she and Scott were exiting Scott's garage, [4] and

[Montoya] says, What's in that building? Or, What is that building? I said, That's my shed. She goes, What's in it?

I said, My stuff, or something like that, just general conversation. She said, I would like to see in there, or something like that.

And I said, Why? And she said, Because I would like to check it out. I said, That's my shed. I don't believe you have the authority to do that, or something like that.

There were probably more conversations but it escalated to the point where I asked her, By what authority do you have to search my shed, my property? It

---

2. The Third Party Notification forms were forms that certain individuals, such as those living on the same property as Nik, were required to sign, acknowledging that they understood Nik's criminal history. (*See* ECF No. 179 at 6, ¶ 24.)

3. In support of this assertion, Scott cites only a portion of his own deposition where he states that he, personally, had never told Montoya about Nik's storage of ladders in the shed, and that he had never heard Nik make such a statement to Montoya either. (*See* ECF No. 179–5 at 146.) Normally, this would not likely be enough to establish a genuine dispute over whether *Nik* told Montoya that he

stored his ladders in the shed. However, Montoya claims that she learned this information from Nik at a probation office visit, and she further claims that Scott accompanied Nik "to virtually all of his probation meetings." (ECF No. 179–8 ¶¶ 11, 13, 19.) Thus, under the circumstances, the fact that Scott never heard Nik speak about the ladders to Montoya is sufficient evidence from which a jury could reasonably conclude that neither Scott nor Nik told Montoya about the ladders before her visit on the day in question.

4. Apparently Nik's living space in Scott's home was a basement apartment somehow accessed through Scott's garage.

is under lock. I have the key. Nik has no access.

She said it was because Nik was living there. And if I didn't want to comply, they would just take Nik away.

(ECF No. 179–5 at 82.)

Scott then "glared at her because [he] couldn't believe the gall that this happens here in America," but he "allowed her to see the shed so she wouldn't take away [Nik]." (*Id.* at 87.) Scott believed that, if Nik was taken away, it would likely lead to him being put back in prison, thus destroying the renewed life that Nik had built on probation. (*Id.* at 130–31.)

Montoya's time in the shed amounted to "[a] minute or two." (*Id.* at 88.) Scott does not claim that Montoya seized or damaged anything, or that any negative consequences followed for either him or Nik on account of what Montoya observed in the shed.[5]

### 3. Other Details

As will become apparent below, one of the parties' major disputes is whether Scott Winder gave valid consent to Montoya's search of the shed. In that regard, the parties spar over various facts potentially relevant to coercion. Montoya says that probation officers in her jurisdiction are not allowed to carry a gun, handcuffs, or mace, and are not allowed to make arrests. (ECF No. 179–8 ¶ 3.) Instead, they are instructed to wear street clothes and carry ID badges. (*Id.*) Montoya accordingly states that she and her partner, Dahl, "never wore a uniform, never carried a gun, handcuffs or mace, and had no right

---

**5.** It appears Scott only seeks nominal damages, and perhaps punitive damages as well. (ECF No. 81 ¶ 94.)

**6.** Montoya says that her desk at the probation office is next to Dahl's, and given Scott Winder's usual presence at Nik's probation office meetings, Scott encountered Dahl at the office

or ability to arrest or detain a person." (*Id.* ¶ 11.) Montoya further states that she was never accompanied by law enforcement officers while visiting Nik. (*Id.* ¶ 3.)

Scott Winder, for his part, does not claim that Montoya came to his home carrying a gun or handcuffs or anything of that nature. He also does not believe that Montoya herself could have arrested anyone. (ECF No. 179–5 at 112.) Rather, at his deposition, he testified that he worried about "the person that was accompanying Ms. Montoya," whose name he apparently did not know, although he almost certainly was referring to Dahl. (*Id.* at 78–79.) Scott referred to this other person as a "police officer" whom he believed to be carrying a gun, although he cannot recall now whether he specifically saw the gun. (*Id.* at 77, 78–79.) He also recalled seeing a handcuff holster on this person's belt. (*Id.* at 111–12.) When Montoya allegedly threatened to take Nik away as a consequence for Scott's refusal to open the shed, Scott believed that this other person would immediately arrest Nik. (*Id.* at 114–15.)[6]

### III. ANALYSIS

The Fourth Amendment states,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"regularly." (ECF No. 179–8 ¶ 11.) Montoya appears to be implying that Scott could not have mistaken Dahl for a police officer or anyone else with authority to arrest. This presents an attack on memory and credibility that the Court cannot resolve through summary judgment.

Montoya does not dispute that her inspection of the shed's interior was a "search" within the meaning of this amendment. She also does not dispute that she lacked a w arrant.

■ A warrantless search of real property "is unreasonable per se under the Fourth Amendment unless the government shows that the search falls within one of a carefully defined set of exceptions, such as a valid consent." *Eidson v. Owens*, 515 F.3d 1139, 1145–46 (10th Cir. 2008) (internal quotation marks omitted). Montoya argues that the consent exception was present in this case, in two ways: (1) Scott Winder's consent to Montoya's search of the shed, and (2) Nik Winder's standing consent, as a term of his probation, to searches of his residence and workplace. Montoya also argues that her lack of a Third Party Consent form from the mechanic living and working in the shed provided her some sort of authority to enter the shed. The Court will address all of these arguments in turn.

## A. Scott Winder's Specific Consent

■ A search authorized by consent is a well-recognized exception to the prohibition against warrantless searches. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The government official performing the search, not the individual subject to the search, has the burden of proving consent. *United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012). In this case, therefore, Montoya has the burden of proving two elements: (1) "unequivocal and specific" consent that was (2) "given without implied or express duress or coercion." *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) (internal quotation marks omitted).

■ Montoya nowhere specifically argues that the first element has been satisfied, but Scott Winder similarly fails to argue that the first element has *not* been satisfied. Moreover, viewing the evidence in the light most favorable to Scott, nothing suggests that he gave only equivocal or nonspecific consent to Montoya's search of the shed. Thus, the Court finds no genuine dispute regarding the first element, and therefore turns to the second element—coercion.

■ Whether consent was coerced, or was instead voluntary, is a fact-bound, totality-of-the-circumstances inquiry. *Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. 2041. The ultimate question is whether "a reasonable person would believe he was free to . . . disregard the officer's request." *United States v. Manjarrez*, 348 F.3d 881, 885–86 (10th Cir. 2003).

Drawing on *United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006), and *United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir. 1997), Montoya offers a catalog of nonexclusive factors that tend to support or detract from a finding of voluntariness:

- the presence of only one or two officers vs. the threatening presence of many officers;
- the officer's pleasant manner and tone of voice vs. the officer's use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory;
- the prompt return of the person's identification and papers vs. prolonged retention of those same items;
- the encounter takes place in public view vs. taking place where no members of the public can observe;
- the officer's advisement that the defendant is free to refuse vs. lack of any such advisement;
- the absence of any display of a weapon vs. the display of a weapon; and

- the absence of physical touching by the officer vs. the presence of such touching.

(ECF No. 179 at 12.) Montoya argues that all of these considerations favor voluntariness on this record, and no reasonable jury could conclude otherwise. (*Id.* at 12–14.)

Scott Winder's response focuses primarily on the factor regarding aggressive language or tone of voice. He claims that Montoya's alleged threat to arrest Nik coerced him into consent. (ECF No. 192 at 10–11.)

A reasonable jury could believe Scott Winder's testimony that Montoya threatened at least to "take away" Nik from his living arrangements, if not arrest him. A reasonable jury could likewise believe Scott Winder's testimony that such a threat struck him in an emotionally sensitive place, given his desire and demonstrated effort to help his brother regain a footing in law-abiding society. Given all that, a reasonable jury weighing all the factors and circumstances could conclude that Scott Winder did not feel free to disregard Montoya's request.

In her reply brief, Montoya offers a policy argument against this conclusion (which the Court has re-punctuated for clarity):

> If the Court agrees with Scott Winder—that a landlord's knowledge (whether he knew it himself or whether a Probation Department representative reminded him of it) that a probationer-tenant could be required by Probation to seek new accommodations if the landlord's property could not be adequately verified, is sufficient to constitute an impermissible threat/coercion of the landlord in violation of the 4th Amendment—then there would be no possible way for a Probation Department to ask to see and verify any property where a probationer

lived or worked, except in the (rare) case where a probationer owns his home and workplace.

(ECF No. 200 at 6 n.1 (underscoring in original).) Apart from being raised for the first time in a reply brief, this argument is severely overstated, and also divorced from the facts of this case. First, in the residential context, it is usually the tenant, not the landlord, that has a Fourth Amendment interest in the rented portion of the property;[7] and tenants themselves almost always have keys to their own apartments and are therefore capable of allowing the probation officer to visit and inspect. Second, in the workplace context, Montoya overlooks the fact that employees usually have authority during normal working hours to invite guests into their workspaces. This case, by contrast, presents an unusual scenario where (if Scott Winder's testimony is believed) a portion of a probationer's workplace was inaccessible to the probationer without the help of a third party. Moreover, a reasonable jury could believe Scott Winder's testimony that Montoya did not know before searching the shed that it was part of Nik Winder's workplace.

In short, a believable set of facts exist under which Montoya lacked voluntary, uncoerced consent to search the shed and therefore violated Scott Winder's Fourth Amendment rights. Summary judgment is therefore inappropriate on this basis.

## B. Nik Winder's General Consent

■ Montoya next points out that Nik agreed, through his terms of probation, to permit Montoya to view his workplace. There is a genuine dispute of fact regarding whether Montoya knew that the shed was part of Nik's workplace before inspecting it. But even if a jury believed Montoya that she wanted to inspect the

---

**7.** *See* 4 Wayne R. LaFave, *Search & Seizure* § 8.5(a) (5th ed., Oct. 2015 update).

shed because Nik had told her about it previously, it does not establish that Montoya had authority to search the shed over Scott Winder's objection. The facts viewed in the light most favorable to Scott show that Nik could only access the shed when Scott opened it for him, and that Montoya knew as much before she insisted on searching the shed.[8]

Montoya cites no authority for the notion that a probationer's consent to have his or her workplace inspected by a probation officer gives that probation officer authority over a third party who owns and controls access to the work premises. Montoya instead quotes the following portion of Colorado Revised Statute § 16–11–290(1): "It is the duty of a probation officer to investigate and report upon any case referred to him or her by the court for investigation." (*See* ECF No. 179 at 14.) This generic statement cannot be interpreted as granting probation officers authority over third parties who control access to locations where probationers or their belongings might be found. Summary judgment on this basis must be denied.

### C. The Relevance of Third Party Notification Forms

■ As mentioned above in Part II.C.1, Scott Winder allowed a mechanic to live in and run a car repair business out of the same shed where Nik stored his ladders. This mechanic's name was Justin Thompson. (ECF No. 179–5 at 49.) Montoya says that she first learned about Thompson from Nik, minutes before asking to inspect the shed. (ECF No. 179–8 ¶ 17.) Given that Nik's terms of probation required signed Third Party Notification forms from every person living on the property, Montoya argues that Nik's admission that Thompson lived there was effectively an admission to violating his probation, since Thompson had never signed a Third Party Notification form. (ECF No. 179 at 17–18.) Thus, she says, the search of the shed was somehow proper.[9]

This argument fails for a number of reasons. To begin, it is not clear whether Montoya herself would actually agree with this argument as presented by her attorneys. Her declaration nowhere states that she believed Nik violated the terms of his probation by failing to obtain a signed Third Party Notification form from Thompson. To the contrary, she states that *the probation officer* is "required to obtain Third Party Notification forms from all persons who reside at or visit the property where the sex offender lives. This requires speaking to the people who are on the property and providing the form for them to sign." (ECF No. 179–8 ¶ 8(iii).) Further, when discussing Thompson in her declaration, she says only that she "knew that the mechanic had not signed one of the Third Party Notification forms." (*Id.* ¶ 21; *see also id.* ¶ 23 ("Because the shed had Nik's work-related materials and there was a new person on the property who[m] *we had not met* and who *had not signed a Third Party Notification form*, I asked to see the shed and asked to verify who was on the property in the daytime and overnight." (emphasis added)).) In short, the Court is unconvinced that this argument of counsel bears any relation either to Monto-

---

**8.** Here, there is no evidence that Nik resisted Montoya's request to inspect the shed. But even if he had, the Court is unaware of any authority that would permit Montoya to demand an inspection over Scott's objection.

**9.** Montoya actually presents this argument in the context of the first element of a qualified immunity analysis, *i.e.*, whether an official violated a statutory or constitutional right. (*See* Part III.D, *infra* (qualified immunity analysis).) Because it ultimately turns on whether a jury could reasonably find that a constitutional violation occurred, the Court finds it more appropriate to address here.

ya's own memory or the legal regime surrounding Third Party Notification forms.

This argument is also a *non sequitur*. Assuming for present purposes that Nik indeed admitted a probation violation by admitting to the presence of a new resident who had not signed the required form, it would at best have given Montoya probable cause to arrest Nik and perform a search of Nik incident to arrest. But: (a) Montoya insists that she does not have authority to arrest, and (b) it is difficult to conceive of a circumstance in which a search incident to arrest provides authority to search a third party's locked outbuilding—particularly one which was, in Montoya's own words, "on a hill away from the house" where she, Scott, and Nik had been standing. (ECF No. 179–8 ¶ 24.) *Cf.* 3 *Search & Seizure* §§ 6.3–6.4 (discussing permissible scope of searching premises incident to the arrest of an individual on those premises).

Montoya may be attempting to argue, however inartfully, that even if the jury believes Scott Winder's story that Montoya threatened to arrest Nik, it was a valid threat and therefore not coercive. Whether or not a valid threat vitiates coercion, Montoya has not put forth evidence from which a jury could conclude that the threat was valid. Again, according to Montoya's declaration, Nik had no duty to obtain Third Party Notification forms from residents on the property. Moreover, Nik was not preventing Montoya from inspecting the shed. *Cf. United States v. Munoz,* 987 F.Supp.2d 438, 449 (S.D.N.Y. 2013) (consent invalid when police officers threatened arrest of family members, but lacked probable cause to make good on that threat).

Thus, the lack of a Third Party Notification form signed by Thompson has no relevance to Montoya's authority to enter a place to which Nik had no right of independent access.

## D. Qualified Immunity

■■■■ Montoya argues that, even if a constitutional violation occurred, she is entitled to qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al–Kidd,* 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (internal quotation marks omitted). Here, the Court has already found that a set of facts exists from which a jury could conclude that Montoya violated Scott Winder's Fourth Amendment rights. Specifically, a jury could believe Scott Winder's testimony that Montoya simply decided that she wanted to search the shed without knowing whether it had any connection to Nik, and that Montoya coerced Scott's consent through an invalid threat to have Nik arrested or otherwise "taken away."

■■■■ The question, then, is whether it was clearly established in 2013 that Montoya's actions (if she indeed acted as Scott claims) violated the Fourth Amendment. "In order for the law to be clearly established there must have been a Supreme Court or other Tenth Circuit decision on point so that the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McFall v. Bednar,* 407 F.3d 1081, 1087 (10th Cir. 2005) (internal quotation marks omitted; alterations incorporated).

The Supreme Court has condemned the use of threats to obtain consent since at least its seminal *Schneckloth* decision in 1973, where the Court first directly addressed the meaning of voluntariness in the context of consent searches. There, the Court stated that "the Fourth and Fourteenth Amendments require that a consent

not be coerced, by explicit or implicit means, by implied threat or covert force." 412 U.S. at 228, 93 S.Ct. 2041. The obvious implication, of course, is that overt or explicit threats are all the more offensive to the Fourth Amendment.

Thus, under at least one view of the facts that a reasonable jury could adopt, Montoya violated a clearly established right. There may be other interpretations that a jury could accept, some of which might entitle Montoya to qualified immunity and others which would not. The Court's task at this summary judgment phase is only to determine whether there is any reasonable interpretation of the evidence that would strip Montoya of qualified immunity. Here, such an interpretation exists, and so the Court may not rule as a matter of law before trial that Montoya is immune from suit. Summary judgment on qualified immunity is therefore inappropriate.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendant Montoya's Motion for Summary Judgment (ECF No. 179) is DENIED; and

2. This matter REMAINS SET for a 2–day jury trial scheduled to begin on November 7, 2016, with a Final Trial Preparation Conference on October 21, 2016, at 4:00 p.m., in Courtroom A801.